**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **QUEEN A. BATCH,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CV-10-BE-0666-W** |
| | ) | |
| **MICHAEL J. ASTRUE** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On April 23, 2007, the claimant, Queen A. Batch, applied for both disability insurance benefits and supplemental security income benefits under Title II and Title XVI of the Social Security Act. The claimant alleges disability commencing on March 30, 2007 because of breast cancer. (R. 32-33). The Commissioner denied the claim on July 5, 2007. (R. 34-39). The claimant filed a timely request for a hearing before an administrative law judge, and the ALJ held a hearing on August 17, 2009. (R. 48, 64). In a decision dated October 16, 2009, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and was thus ineligible for both disability insurance benefits and supplemental security income. (R. 22). On October 29, 2009, the claimant appealed the ALJ's decision to the Appeals Council, and on January 28, 2010 the Appeals Council denied review. (R. 7, 9-11, 1). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42, U.S.C. §§

1

405(g) and 1383(c)(3).  For the reasons stated below, this court reverses the decision of the Commissioner and remands for further consideration consistent with this opinion.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether substantial evidence supports the ALJ's findings that 1) the claimant did not meet or medically equal a mental impairment listing, and 2) had an RFC with mental limitations, when the ALJ based his decision primarily on undocumented or nonexistent state agency medical and psychological consultants.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports the factual conclusions.  *See* U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of evidence that detracts from the evidence relied on by the

ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).  To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth
> in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or,
> on steps three and five, to a finding of disability.  A negative answer to any question,
> other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

While the scope of review of the ALJ's factual determinations is deferential, "[the court]

cannot, however, conduct a review that is both limited and meaningful if the ALJ does not state

with sufficient clarity the legal rules being applied and the weight accorded the evidence

considered." *Ryan v. Heckler*, 762 F.2d 939, 941-942 (11th Cir. 1985).  Part of the ALJ's basic

obligation to develop a full and fair record includes making clear the weight accorded to each

item of evidence and the reasons for the decision.  *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th

Cir. 1981).  Because the reviewing court must be able to "determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence," it is insufficient for the ALJ to simply state that he considered all of the evidence. *Ryan*, 762 F.2d at 942.

## V. FACTS

The claimant has completed two years of college in nursing, and has past work experience as a licensed practical nurse.  (R. 86, 21, 81).  The claimant was 45 years old at the time of the ALJ hearing.  (R. 21, 65).  The claimant originally alleged that she was unable to work because of a primary diagnosis of neoplasm of breast.  (R. 32, 33).  However, the Social Security Commission denied her application because it "determined that [her] condition [was] not expected to remain severe enough for 12 months in a row to keep [the claimant] from working." (R. 39).  When the claimant appealed that determination in the administrative hearing, the claimant testified about both her level of pain and her "major . . . depressive disorder." (R. 25-26, 28).  The claimant's alleged disability began on March 30, 2007 when she stopped working because of weakness, joint pain, and nausea caused by her breast cancer.  (R. 80, 32, 33).

*Physical Limitations*

On March 30, 2007, claimant reported to DCH Regional Medical Center because of a mass in her left breast.  (R. 125-126, 136-138).  Dr. William L. Pridgen, a general surgeon, recommended and performed a wide excision on claimant's left breast.  (R. 126, 139-140).  After test results confirmed that the mass was malignant, Dr. Pridgen performed a sentinel node biopsy to determine whether the cancer had spread into the lymphatic system on April 4, 2007.  (R. 143,

169, 121, 122-124).  Because the results of the sentinel node biopsy were negative for metastasis, Dr. Pridgen referred claimant to Dr. John W. Dubay, an oncologist at the DCH Cancer Treatment Center for chemotherapy and radiation treatment.  (R. 120, 155).

Dr. Dubay began seeing claimant on April 19, 2007, and administered the claimant's first cycle of chemotherapy on May 15, 2007.  (R. 155, 160).  On June 5, 2007, claimant went back to Dr. Pridgen for a routine follow-up examination, in which Dr. Pridgen noted that claimant "ha[d] no complaints," and "seem[ed] to be doing fine" since starting chemotherapy.  (R. 170).  Dr. Samuel H. Chastain, a state agency medical reviewer, summarized Dr. Pridgen's June 5, 2007 follow-up examination of the claimant in a brief medical review of claimant's condition, written on July 5, 2007.  (R. 197).  Dr. Chastain examined no other records in his report, but specifically noted Dr. Pridgen's conclusion that claimant was "[d]oing fine." (197).

After claimant underwent four cycles of chemotherapy treatment using Adriamycin and Cytoxan, Dr. Dubay recommended she receive additional weekly treatments of Taxol (another chemotherapy drug) in a clinical note written July 11, 2007.  (R. 195).  When claimant began developing some neuropathy, Dr. Dubay recommended switching to weekly treatments of Taxotere instead.  (R. 277).  Claimant received her final round of Taxotere on October 3, 2007. (R. 273).

Because claimant opted for breast conservation, she underwent additional radiation treatment after completing chemotherapy.  (R.121, 155).  On October 18, 2007, claimant began a radiation treatment program with Dr. Melanie D. Graham, a radiation oncologist.  (R. 296, 308). Claimant received her last radiation treatment on December 13, 2007.  (R. 307).

On February 13, 2008, claimant underwent both a bilateral digital mammogram and

ultrasound because of concern with a palpable area in the right breast.  Dr. R. Douglas Hamiter, a physician specializing in radiology at the Department of Imaging Services at Northport Medical Center, concluded that there was no mammographic or sonographic evidence of malignancy in the right breast.  (R. 316).

On March 19, 2008, claimant met with Dr. Christopher Jordan, an oncologist at the DCH Cancer Treatment Center, for a follow-up examination.  Dr. Jordan found a nodular area in the left axilla (armpit) along the scar line that he believed to be underlying scar tissue, but concluded that it was "unclear." Although he stated it was "more likely scar tissue," his final impression noted that the nodular area was "concerning for possible disease," and he referred claimant back to Dr. Pridgen "for evaluation of possible axillary mass in the left axillary fat area." (R. 305, 306).

On March 25, 2008, claimant met with Dr. Pridgen for a follow-up examination.  Dr. Pridgen noted the claimant completed her radiation and chemotherapy but still had some pain in her left arm.  Upon examination, Dr. Pridgen reported that the skin incision in the axilla had retracted, "giving the impression [that] there [was] a mass in her axilla" when none existed.  Dr. Pridgen otherwise concluded that claimant "[seemed] to be doing quite well," noting that her appetite was good and that she was not losing any weight.  He advised claimant to return in three months for another appointment.  (R. 321)

In another follow-up at DCH Cancer Treatment Center on June 10, 2008, Dr. Graham noted that claimant had been experiencing hot flashes and difficulty sleeping, despite having prescription medication for both.  Claimant had also reportedly lost a few pounds since the last visit, and still felt some soreness in her left breast "that continue[d] to improve." Dr. Graham

6

noted that claimant did not have any swelling in her left arm or complaints of musculoskeletal pain.  (R. 303).  She concluded that claimant was "clinically stable with no evidence of disease," but also ordered a follow-up in three months with a left mammogram.  (R. 304).

On June 24, 2008, claimant met with Dr. Pridgen for a scheduled follow-up.  Dr. Pridgen noted that claimant "ha[d] no complaints other than the right upper quadrant of her left breast, which [wa]s a little sore." Despite this, "[s]he ha[d] no new aches or pains." He noted that her hair was "growing back fine," her appetite was "good," and that she was "not losing any weight." Overall, Dr. Pridgen characterized her history and her exam as "unremarkable." (R. 320)

Claimant met with Dr. Graham again on August 4, 2008, a month earlier than anticipated, after claimant visited the emergency room because of pain in her sternal area, knees, and left hip. The Motrin and Flexeril claimant received at the emergency room reportedly helped some, but claimant reported she was still in pain and the Flexeril was making her very sleepy.  (R. 310). Dr. Graham noted that the emergency room ruled out any kind of cardiac origin, and ordered a PET scan in addition to the scheduled mammogram to rule out any evidence of breast cancer. She advised claimant to keep her existing appointment and return in a month with her scans.  (R. 301-302).

On September 11, 2008, claimant returned and met with Dr. Graham as scheduled. Claimant still complained of intermittent pain in the sternal area, but admitted that Motrin did provide relief.  Dr. Graham concluded that the PET scan "showed no metastases," and that the mammogram returned back clear.  She advised claimant to return in six months for a follow-up. (R. 299).

In a follow-up with Dr. Pridgen, claimant's surgeon, on October 28, 2008, Dr. Pridgen

recorded that claimant had felt no new masses, although she had reported residual tenderness in her axilla. Claimant reportedly "still live[d] with anxiety that this [wa]s going to come back . . [and was] good about performing self-breast examination . . . ." Upon examination, Dr. Pridgen noted that he found no new masses on either breast and that both the left axilla and the right axilla were normal. Overall, Dr. Pridgen concluded claimant was doing well and advised her to return to the clinic in six more months. (R. 319).

*Mental Limitations*

The claimant first met with Dr. Srilata Anne, her treating psychiatrist on March 31, 2008. The claimant chiefly complained of difficulty sleeping and depression. Dr. Anne conducted an initial psychiatric evaluation, noting claimant was divorced, lived alone, and had battled breast cancer, undergoing both chemotherapy and radiation treatment. The claimant reportedly had no appetite or motivation to do anything, admitting that she cried easily and often felt hopeless. Dr. Anne also reported that claimant had been "hearing a voice calling her name." The claimant reported feeling anxious and having panic attacks. Dr. Anne diagnosed claimant with Major Depressive Disorder, recurrent with psychotic symptoms, and gave the claimant a Global Assessment of Functioning (G.A.F.) score of 50, indicating serious symptoms or serious impairments in social, occupational, or school functioning. She also noted that claimant had lost her job and was not able to go back to work. (R. 206). Dr. Anne consequently prescribed 75 mg of Effexor XR (a depression and anxiety medication), .5 mg of Ativan (a high-potency, short-intermediate acting anxiety medication), and 50 mg of Vistaril (an antihistamine that is also used as a sedative to calm anxiety and tension). (R. 211).

On April 28, 2008, claimant told Dr. Anne that she was "doing ok" after going on a cruise

to Mexico for six days with a friend.  Claimant was reportedly doing "better but still feeling low." On her vacation, claimant had spent most of the time on her own and had missed two doses of medication.  Claimant noticed that when she missed her medication, she felt hopeless. Claimant reported continuing problems with sleep, although she admitted she slept better with her Vistaril.  Dr. Anne continued all of her prescriptions, adding a prescription for Effexor XR at 150 mg in addition to claimant's existing prescription for Effexor XR at 75 mg.  (R. 205).

On June 23, 2008, claimant reported to Dr. Anne that she was doing okay, but was still not sleeping well, getting only 4-5 hours a night.  Claimant reported no appetite loss, although she admitted that when she would miss a dose of her medication, she would "[start] crying for no reason and [get] anxious." Dr. Anne noted that claimant did not experienced psychotic symptoms when compliant with her medication, although claimant had been experiencing dry mouth as a side effect.  Dr. Anne reported that claimant's concentration was not good, and continued claimant's prescriptions except for Vistaril, which Dr. Anne discontinued.  Dr. Anne also added a prescription for 50 mg of Trazodon (an anti-depressant).  (R. 204).

On September 22, 2008, claimant reported to Dr. Anne that she had not experienced a panic attack in the past three months.  With medication, claimant reportedly experienced less depression and less anxiety.  Dr. Anne noted that claimant's appetite was good, but that claimant still had difficulty sleeping on some nights.  Dr. Anne continued the claimant's prescriptions, and increased the dosage of Trazodone from 50 mg to 150 mg.  (R. 203).

On December 22, 2008, claimant reported to Dr. Anne that she had been having chest pain and difficulty breathing, which she attributed to her previous radiotherapy treatment. Claimant reported that she had been feeling anxious, but did not experience psychotic complaints

when she took her medication.  Dr. Anne continued claimant's prescriptions, and again increased the dosage of Trazodone from 150 mg to 300 mg.  (R. 202).

On March 23, 2009, Dr. Anne noted that claimant's appetite was good, that she had not had panic attacks, and that she was feeling less depressed some days with her medication, although she admittedly still had some bad days.  Dr. Anne reported that claimant spent most of her time at home watching T.V., and that sleep still posed a problem for claimant.  Although claimant had not experienced psychotic symptoms and had maintained a good appetite, the claimant reported that even with the medication, she felt better some days than other days.  Dr. Anne continued the claimant's prescriptions, reducing the Trazodone from 300 mg to 150 mg and adding a 150 mg prescription for Ambien.  (R. 213).

On July 20, 2009, Dr. Anne took claimant off of Ambien because it was ineffective in helping claimant to sleep.  Claimant reported sleeping for 10 hours and remaining awake for 36 hours before being able to fall back asleep.  Although her appetite was still okay and she had not experienced any more psychotic symptoms, she admitted that even with her medication she had been "feeling depressed, [and] not wanting to go out." These feelings had reportedly lasted for at least one month.  Dr. Anne noted that claimant had been compliant with her medication, and that she had experienced no psychotic symptoms.  Dr. Anne continued the claimant's medications. (R. 241).

The record does not reflect that the Commissioner referred the claimant to any state agency for medical or psychological evaluation, or that any consultant ever provided an examination.  In addition, the record does not show that any state medical reviewer ever examined any records relevant to the claimant's mental impairments, including the claimant's

10

treating psychiatrist's records.

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance and supplemental security income benefits on July 5, 2007, the claimant requested and received a hearing before an ALJ on August 17, 2009.  (R. 34, 40, 48).  At the hearing, the claimant first testified about the extent of her pain.  She stated that on a scale of one to ten, her present pain was an eight out of ten in her left hip, shoulder, and both knees.  (R. 25, 26).  While claimant did not say specifically what caused her present pain, the attorney subsequently solicited testimony about the difficulties claimant had experienced during her cancer treatments, which she completed nearly two years prior to the ALJ hearing.  (R. 26, 307, 22).  Claimant testified that during her chemotherapy and radiation treatments, her chief complaints were nausea and aching bones.  She explained that immediately after a radiation treatment, she would experience nausea and a pain rating nine out of ten.  Claimant additionally stated that because of those side effects, she had spent seven to eight hours during the day lying down during her recovery.  (R. 26).

When the attorney inquired into claimant's present injuries, claimant testified that although she was predominantly left handed, she experienced difficulty opening jars, holding jugs of milk, and gripping objects with that hand.  (R. 27) Claimant explained that these difficulties were a result of a lymph node removal procedure under her left arm.  (R. 29).  In addition to those injuries, claimant also indicated that she was still often short of breath because of her previous radiation and chemotherapy treatment.  Because claimant could not walk very far, her four sisters and mother would come to help her with the household chores.  (R. 27).

When asked about her mental health, claimant stated that she had been seeing a

11

psychiatrist who had diagnosed her with Major Depressive Disorder.  (R. 27-28).  She testified that the medication her psychiatrist prescribed made her drowsy, and consequently, she still spent six to seven hours lying down during the daytime.  Claimant also testified that she had been hearing voices, although she admitted that the medication that her psychiatrist prescribed her helped "some." (R. 28).

After the claimant's testimony, the ALJ asked the vocational expert about the claimant's past relevant work.  The VE testified that claimant had been a registered nurse with transferable skills to both "light as well as sedentary work." *Id*.  The ALJ then asked the VE if there were jobs in the local or national economy that an individual with claimant's age, education, and past relevant work experience could do that involved only "light work . . . simple instructions, [no] more than two hours of . . . concentration without a break, and only occasional fine manipulation." The VE testified that unskilled entry level jobs consistent with the limitations the ALJ had outlined did exist, including "ticket takers at theaters, amusement parks . . . order clerks . . . [and] cashiers . . . ." (R. 29).

In conclusion, the claimant's attorney asked the VE if claimant could perform any job "[if] the Judge were to find [his] client's testimony credible . . . ." The VE testified that if the claimant really experienced the "pain . . . and . . . limitations as she described," she would not be able to work. The claimant's attorney finished his questions to the VE by asking whether a G.A.F. score of 50 would also prevent claimant from working.  The VE responded that if the judge found that a G.A.F. of 50 was consistent with the other evidence, such a low score would prevent the claimant from working.  (R. 30).

*The ALJ's Decision*

On October 16, 2009, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act.  (R. 22).  First, although the ALJ found that the claimant had worked after the alleged disability onset date, he held that the claimant's earnings did not rise to the level of substantial gainful activity.  Next, the ALJ concluded that claimant had two severe impairments: "status/post neoplasm of breast and depression." The ALJ held that both impairments were severe because they significantly limited "the claimant's ability to perform basic work activities." (R. 17)

Despite finding severe impairments, however, the ALJ concluded that the claimant did "not have an impairment or combination of impairments that [met] or medically [equaled] one of the listed impairments . . . ." The ALJ "[b]ased [his decision] upon the uncontradicted and reasonable opinion of the state agency medical/psychological consultants [that] the claimant's impairments [did] not meet or medically equal any listed impairment." The ALJ did not, however, specify on which state agency medical or psychological consultant he relied.  Instead, the ALJ supported his application of the Psychiatric Review Technique Form (PRTF) by using the claimant's own statements to determine whether the claimant met a mental impairment listing. (R. 18).

In finding that the claimant had only mild restriction in activities of daily living, the ALJ concluded that while the claimant's "mother and sisters help[ed] perform household tasks including cleaning and cooking," the claimant was able to "bathe, shower, dress, and fix her hair independently." The ALJ similarly supported his conclusion that the claimant had only moderate difficulties in social functioning noting that "[t]he claimant socializes with family members."

13

Although the ALJ acknowledged that claimant's "pain . . . [and] auditory hallucinations . . . interrupt[ed] her concentration," the ALJ found that the claimant had only moderate difficulties with concentration, persistence, or pace.  In the final category of the PRTF, the ALJ simply concluded that "claimant ha[d] experienced no episodes of decompensation . . . of extended duration." Ultimately, the ALJ decided that "[b]ecause the claimant's mental impairments [did] not cause at least two 'marked' limitations . . . the 'paragraph B' criteria [of the 12.04 mental impairment listing were] not satisfied." (R. 18).

After finding that the claimant did not meet or medically equal a listing, the ALJ concluded that claimant was still able to perform light work, subject to "simple instruction[,] [n]o more than 2 hours without a break[,] and only occasional fine manipulation." To support this modified RFC, the ALJ "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [including] opinion evidence." (R. 19).  Ultimately, the ALJ concluded that while "claimant's medically determinable impairments could [have] reasonably be[en] expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extent that they [were] inconsistent with . . . [his] residual functional capacity assessment." (R. 20).

In finding the extent of the claimant's alleged symptoms not credible, the ALJ first relied on Dr. Chastain's report on the claimant's medical condition during her cancer treatment.  Dr. Chastain, a state agency medical reviewer who never examined the claimant, summarized Dr. Pridgen's June 5, 2007 assessment of claimant a month after the sentinel node biopsy.  (R. 19, 170, 197).  The ALJ used Dr. Chastain's review to highlight the conclusions of both the state

14

agency and Dr. Pridgen that claimant "had no complaints," and was indeed "doing fine" shortly after starting her chemotherapy and radiation treatments.  (R. 19-20).

The ALJ then cited one of Dr. Anne's assessment of claimant reports, in which she wrote that claimant "was feeling 'so-so,'" had a good appetite, and had "no physical complaints with her medication except [that] she had dry mouth."[1]  Although Dr. Anne, the claimant's treating psychiatrist, had also assigned claimant a G.A.F. score of 50 on March 31, 2008, the ALJ diminished the importance of this evidence by pointing out that it was "only a one-time G.A.F. score." (R. 20).  He later stated that although the "vocational expert testified that a G.A.F. score of 50 is prima facie evidence of a disabling condition . . . it [was] only one of many things to consider in determining whether a claimant [could] perform basic work activities." (R. 21). Based on this evidence, the ALJ concluded that the claimant's depression "[could] be accommodated at a light residual functional capacity with psychological limits . . . ." He explained that although her treatment suggested that her impairments were severe, an unnamed DDS medical reviewer had "rated the claimant's impairments as non-severe because they [did] not meet the duration requirement . . . ." (R. 20, 39).

Finally, he ALJ cited Dr. Pridgen's June 2, 2009 meeting with claimant, in which he reported that claimant "'ha[d] no real complaints'" following her radiation and chemotherapy treatment.  (R. 20, 217).  The ALJ acknowledged that claimant had an abnormal radiological finding that was inconclusive, but relied on Dr. Pridgen's subsequent diagnostic impression that "claimant was doing well," as a later MRI showed no rib abnormality.  The ALJ also specifically

---

[1]     Although the ALJ stated that Dr. Anne, wrote these notes in their March 31, 2008 meeting, the record of that appointment does not support the ALJ's summary.

held that the claimant's testimony that she experienced a pain rating of eight out of ten and had difficulty gripping with her dominant hand was not credible because "her symptoms [were] not supported by the treatment notes" which he characterized as "fairly routine." (R. 20).

The ALJ specifically noted that in addition to the medical evidence he highlighted, "[c]onsideration also had been given to the reports of the state agency medical consultants as well as to other treating, examining, and non-examining medical sources." In bolstering the credibility of these state agency medical consultants, the ALJ stated that "the findings made by the state disability determinations agency medical consultants regarding the nature and severity of the claimant's impairments have been considered as expert opinion evidence of non-examining sources . . . ." In recognition of his reliance on reviewing sources who did not physically examine the claimant, the ALJ stated that while "[t]hese state agency medical consultants at the reconsideration and initial levels did not examine the claimant . . . they provided explanations as to their opinions." The ALJ concluded that any additional evidence received into the record did "not particularly alter these state agency medical consultants' opinions about the claimant's residual functional capacity," and "[t]herefore, these opinions [were] given greater weight." (R. 20-21)

After defending his determination of claimant's RFC, the ALJ concluded that the claimant was unable to perform any past relevant work as a licensed practical nurse. After considering claimant's age, education, work experience, and residual functional capacity, however, the ALJ concluded that "there [were] jobs that exist in significant numbers in the national economy that the claimant [could] perform." (R. 21). Because the ALJ recognized that the additional limitations he placed on claimant impeded the "claimant's ability to perform all or

16

substantially all of the requirements" of light work, he relied on the vocational expert's testimony that the claimant "would be able to perform the requirements of representative occupations such as ticket taker[s] . . . [or] order clerks." The ALJ concluded by saying that "[b]ased on the testimony of the vocational expert . . . the claimant [wa]s capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 22).

Based on the ALJ's determination that the claimant failed to meet a listing and had a residual functional capacity that would allow her to adjust to other work that exists in significant numbers in the national economy, he ultimately concluded that "[t]he claimant has not been under a disability, as defined in the Social Security Act, from March 30, 2007 through the date of this decision . . ." (R. 22).

## VI. DISCUSSION

The claimant argues that the ALJ erred in repeatedly relying on the opinions of undocumented state agency medical and psychological consultants.  (Pl. Br. 4).  This court agrees.

While this court reviews *de novo* "the legal principles upon which the Commissioner's decision is based,"*Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen* 729 F.2d 129, 131 (11th Cir. 1986)), the court's role in reviewing the ALJ's factual determinations is a limited one.  "[The court] may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  Such deference requires that "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision, [it] must affirm if the decision is supported by substantial evidence." *Id*.  Substantial evidence is "such relevant evidence as a

17

reasonable person would accept as adequate to support a conclusion." *Id*.

While the scope of review is deferential, "[the court] cannot, however, conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered." *Ryan*, 762 F.2d at 941-942. Part of the ALJ's basic obligation to develop a full and fair record includes making clear the weight accorded to each item of evidence and the reasons for the decision. *Cowart*, 662 F.2d at 735. The ALJ may not, for example, simply state that he considered all of the evidence because a reviewing court is "unable to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence . . . ." *Ryan*, 762 F.2d at 942.

In mental impairment cases, an ALJ has the additional responsibility to incorporate a Psychiatric Review Technique Form (PRTF) in his or her decision when a claimant presents a "colorable claim of mental impairment. *Moore*, 405 F.3d at1214. In addition to the PRTF's importance in helping ALJs to evaluate the severity of mental impairments, the special technique also helps ALJs to "[i]dentify the need for additional evidence to determine impairment severity . . . ." 20 C.F.R. § 404.1520a(a)(1) (Effective August 1, 2006 to November 11, 2010). Because mental impairments require additional care in evaluation, under Eleventh Circuit precedent, the failure to attach or incorporate a PRTF evaluation into the decision"requires remand." *Moore*, 405 F.3d at 1214.

In applying the PRTF examination, an ALJ "must consider findings of State agency medical and psychological consultants" even if the ALJ is not bound by any of their findings. 20 C.F.R. § 404.1527(f)(2)(I) (Effective August 1, 2006 to November 11, 2010). In addition, an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of

[the claimant's] impairment(s) and on whether [the claimant's] impairment(s) equals the requirements of any impairment listed . . . ." 20 C.F.R. § 404.1527(f)(2)(iii) (Effective August 1, 2006 to November 11, 2010).  Because of the Commissioner's duty to fully develop the record, "'[i]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision.'" *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988) (quoting *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984). Additionally, "in any case where there is evidence which indicates the existence of a mental impairment, [a decision] shall be made only if the Commissioner of Social Security has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment." 42. U.S.C.A. § 421(h).  *See also McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1998).

*Mental Impairment Listing*

In the case *sub judice*, the ALJ concluded that, although the claimant's impairments of status/post neoplasm of breast and depression were both severe, the claimant's combination of impairments did not meet or medically exceed the 12.04 mental impairment listing.  (R. 17-18). The ALJ stated that his determination was "[b]ased upon the uncontradicted and reasonable opinion of the state agency medical/psychological consultants . . . ." (R. 18).  However, the ALJ failed to name or cite a single state agency medical or psychological consultant.  While Dr. Chastain wrote a one-paragraph summary of one of Dr. Pridgen's appointments with claimant, and the unnamed reviewer who denied claimant's original application relied on a few of the claimant's early medical records regarding her breast cancer diagnosis, neither of these medical reviewers examined records relevant to the claimant's *mental* impairments.  Additionally, the

19

ALJ specifically stated that he relied on state agency medical/psychological *consultants*, not medical reviewers.  An examination of the record reveals no documentation of a single state agency medical or psychological consultant examining the claimant.  Thus, this court cannot determine whether the "uncontradicted and reasonable opinion[s]" upon which the ALJ relied actually exist, or what they stated.

Instead of relying on the opinions of experts, the ALJ conducted the PRTF on his own, concluding that claimant had only mild restriction in activities of daily living because "claimant reported she can bathe, shower, dress, and fix her hair independently." Similarly, the ALJ concluded that claimant had only moderate difficulties in social functioning because she "socializes with family members," when they help claimant perform household tasks.  The ALJ similarly concluded that claimant had moderate difficulty regarding concentration, persistence, or pace.  While he acknowledged the claimant's testimony that her pain (which she rated as an 8 on a scale of 1 to 10) and auditory hallucinations continually interrupted her ability to concentrate, the ALJ failed to cite any reason that this testimony did not merit being rated as a 'marked' restriction.  (R. 18).  While the substantial evidence standard of review is deferential, even if the ALJ had not relied upon undocumented state agency consultants in determining that the claimant did not meet the mental impairment listing, this court questions whether the ALJ supplied substantial evidence in his PRTF as written.

*Modified Residual Functional Capacity*

The ALJ also concluded that claimant has a residual functional capacity to perform light work with the added limitation of simple instructions, no more than two hours without a break,

and only occasional fine manipulation.  Although the ALJ stated claimant's underlying "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he held that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 20).

In reaching this determination, the ALJ relied specifically on the record of Dr. Samuel Chastain, a state agency medical reviewer who wrote a short paragraph summary of the claimant's visit with Dr. Pridgen on June 5, 2007, in which Dr. Pridgen said claimant appeared to be "[d]oing fine" after her breast conservation surgery.  (R. 19, 170, 197).  Although Dr. Chastain was only a medical reviewer, he was the only state agency medical employee named in the record.  While a medical reviewer is a valid source of opinion testimony, Dr. Chastain's summary does not support the ALJ's RFC assessment because Dr. Chastain based his remarks solely on one record that made no reference at all to her *mental* impairment history.

In addressing evidence of the claimant's mental impairment, the ALJ dismissed the G.A.F. score of 50 as "one-time," and cited an unnamed DDS medical reviewer who "rated claimant's impairments as non-severe because they [did] not meet the duration requirement . . . ." (R. 20).  The DDS medical reviewer, however, wrote those comments in an attempt to explain why the SSA initially rejected claimant's disability claim based exclusively on breast cancer.  (R. 39).  The DDS medical reviewer listed every record relied upon in making the determination, and included no mental history records in the undated report.  Because the DDS medical reviewer only considered the claimant's medical records through July 2, 2007, and the claimant received her G.A.F. score on March 31, 2008, the DDS medical reviewer's conclusion that claimant's

21

condition did not meet the duration requirement referred exclusively to her breast cancer treatment, and does not support the ALJ's rejection of the claimant's low G.A.F. score.

Finally, while the ALJ concluded the claimant's allegations were not credible in light of the "objective evidence," the ALJ also stated that "[c]onsideration ha[d] also been given to the reports of state agency medical consultants as well . . . ." Although the ALJ again failed to state to which agency medical consultants he was referring, if indeed such consultants exist at all, the ALJ went into extensive detail defending his reliance on these sources.  He began by noting that "the findings made by the state disability determinations agency medical consultants regarding the nature and severity of the claimant's impairments have been considered as expert opinion evidence of non-examining sources," and that while "the state agency medical consultants . . . did not examine the claimant . . . they provided explanations as to their opinions." (R. 20).  He concluded by acknowledging that, although the claimant submitted new and material information that could have bolstered her claim, the evidence "d[id] not particularly alter these state agency medical consultants' opinions about the claimant's residual functional capacity[, and] [t]herefore, these opinions [were] given greater weight." (R. 20-21).

Ultimately, neither the original medical reviewer who denied the claimant's disability application because her breast cancer was "not expected to remain severe enough for 12 months in a row to keep [her] from working," nor Dr. Chastain, the medical reviewer who wrote a one-paragraph summary of a follow-up claimant had with Dr. Pridgen, addressed any *mental* impairment information.  Because the ALJ apparently relied heavily on state agency medical consultants to find that claimant did not meet or medically equal a medical listing and still retained an RFC with mental limitations, the court must have more information about these other

sources to make a determination about whether substantial evidence supports the ALJ's decision.

The numerous references to sources that either do not exist in the record or do not support the conclusions the ALJ made are very troubling.  In light of the many errors that prevent this court from evaluating whether substantial evidence supports the ALJ's decision, this court reverses the decision of the ALJ and remands for further consideration consistent with this opinion.  This court, however, expresses no opinion as to the credibility of the claim.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence does not support the decision of the Commissioner, and is consequently to be REVERSED and REMANDED consistent with this opinion.  The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 27th day of June 2011.


KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE